CHRISTOPHER JOSEPH DESALVA (SBN 172209)
LAW OFFICE OF CHRISTOPHER JOSEPH DESALVA
45-902 Oasis Street, Suite D, Indio, CA 92201
Telephone: (760) 447-0031 | Email: desalvalaw@gmail.com

Attorney for Petitioner
MARTIN HUMBERTO MOSCUI

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA — EASTERN DIVISION**

| | |
|---|---|
| MARTIN HUMBERTO MOSCUI, (A# 242-365-814),<br><br>Petitioner,<br><br>v.<br><br>FERETI SEMAIA, Warden, Adelanto ICE Processing Center; THOMAS GILES, Field Office Director, U.S. Immigration and Customs Enforcement, Los Angeles Field Office; DAVID VENTURELLA, Acting Director, U.S. Immigration and Customs Enforcement; MARKWAYNE MULLIN, Secretary, U.S. Department of Homeland Security; and TODD BLANCHE, Attorney General of the United States,<br><br>Respondents. | Case No. ______________________<br><br>**VERIFIED PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241; REQUEST FOR ORDER TO SHOW CAUSE WITHIN THREE (3) DAYS; DECLARATORY RELIEF**<br><br>**IMMEDIATE RELEASE REQUESTED** |

## I. INTRODUCTION

1. Petitioner MARTIN HUMBERTO MOSCUI (A# 242-365-814) is a 56-year-old citizen of Ecuador who was lawfully admitted to the United States on a B-2 visa, who has lived openly at a Salt Lake City, Utah address known to the Department of Homeland Security ("DHS"), who holds a DHS-issued Employment Authorization Document valid through April 28, 2030 (Exhibit A), and whose application for asylum has been pending before U.S. Citizenship and Immigration Services ("USCIS") since September 13, 2024 (Exhibit B). He has no criminal history. He has never missed an appointment with any agency, because none was ever scheduled; he was waiting for USCIS to interview him.

2. On August 14, 2026, at approximately 8:55 a.m., plainclothes officers of U.S. Immigration and Customs Enforcement ("ICE") seized Petitioner without a warrant inside the secured concourse of John Wayne Airport in Santa Ana, California, minutes after he had arrived on a domestic flight with his son and his son's fiancée to see the venue for his son's wedding (Exhibit C). The officers wore T-shirts and civilian trousers; two travelers who watched from a nearby gate, strangers to the family, did not at first realize they were law-enforcement officers (Exhibits D, E). When Petitioner's son pleaded with the officers to let him show them his father's immigration papers, they ignored him. The officers pinned Petitioner against a pillar, took him to the floor, and discharged an electro-muscular disruption device ("taser") into him — according to one eyewitness, repeatedly, and after he had put his hands behind his back to be handcuffed (Exhibit E). Only afterward, by ICE's own account, did an officer tell him "that they had a warrant for his arrest." ICE's Record of Deportable/Inadmissible Alien (Form I-213), the only contemporaneous Government record of the arrest, is Exhibit C.

3. The I-213 establishes the illegality of the arrest on its face. It records that ICE received a "domestic flight lead" on August 13, 2026 — a full day before the arrest — and chose to conduct a "targeted enforcement operation" rather than obtain a warrant. It prints Petitioner's home address. It concedes that his asylum application "is pending with USCIS." And it contains no finding, and no facts that could support a finding, that Petitioner was "likely to escape before a warrant can be obtained," which is the only circumstance in which Congress has authorized an immigration officer to arrest a person without a warrant. 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2)(ii).

4. Nineteen days after this arrest, the United States District Court for this District entered a preliminary injunction in *Vasquez Perdomo v. Mullin*, No. 2:25-cv-05605-MEMF-SP, Dkt. 738 (C.D. Cal. Sept. 2, 2026), holding that the Government was likely engaged in a policy of warrantless immigration arrests in the Central District without the individualized likelihood-of-escape determination that § 1357(a)(2) requires, and enjoining it; the court also certified a class of persons so arrested since June 6, 2025, *id.*,

Dkt. 739. Petitioner — arrested without a warrant in this District after June 6, 2025, without any escape assessment — is a member of that class.

5. Petitioner has now been detained at the Adelanto ICE Processing Center for forty-six (46) days as of September 29, 2026. An Immigration Judge denied his request for a change in custody status on September 14, 2026 (Exhibit F). This Petition does not ask the Court to review that bond decision. It challenges the custody itself: custody that originated in, and continues to rest upon, an arrest the statute forbade. Because Petitioner is "in custody in violation of the Constitution or laws or treaties of the United States," 28 U.S.C. § 2241(c)(3), he respectfully requests that the Court issue an order to show cause returnable within three days, 28 U.S.C. § 2243, and thereafter grant the writ and order his immediate release.

## II. JURISDICTION AND VENUE

6. This Court has subject-matter jurisdiction under 28 U.S.C. § 2241(a) and (c)(3), 28 U.S.C. § 1331, and Article I, Section 9, Clause 2 of the Constitution (the Suspension Clause). Federal courts retain jurisdiction under § 2241 to hear challenges to the lawfulness of immigration detention; 8 U.S.C. § 1226(e) bars review only of discretionary custody decisions, not of the legal framework within which they are made. *Hernandez v. Sessions*, 872 F.3d 976, 987–88 (9th Cir. 2017) see *Zadvydas v. Davis*, 533 U.S. 678, 687–88 (2001). Declaratory relief is available under 28 U.S.C. §§ 2201–2202. This Petition does not challenge any order of removal, the Notice to Appear, or the merits of Petitioner's asylum claim, and 8 U.S.C. § 1252 is therefore not implicated.

7. Venue is proper in the Central District of California under 28 U.S.C. § 2241(d) and 28 U.S.C. § 1391(e) because Petitioner is physically detained within this District at the Adelanto ICE Processing Center, 10250 Rancho Road, Adelanto, California 92301 (San Bernardino County), his immediate custodian is located there, and the arrest giving rise to the custody occurred in Santa Ana, California, within this District. Assignment to the Eastern Division is proper because Petitioner is detained in San Bernardino County, which lies in that Division, 28 U.S.C. § 84(c)(1); see C.D. Cal. General Order 26-11, §

I.B.1.a(1)(b) This Petition is subject to General Order 26-05 (Immigration Habeas Petitions Under 28 U.S.C. § 2241).

## III. PARTIES

8. Petitioner MARTIN HUMBERTO MOSCUI is a native and citizen of Ecuador, born in 1970. He is detained in the custody of Respondents at the Adelanto ICE Processing Center.

9. Respondent FERETI SEMAIA is sued in his official capacity as Warden of the Adelanto ICE Processing Center, 10250 Rancho Road, Adelanto, California 92301, a facility operated by The GEO Group, Inc. under contract with ICE. He is Petitioner's immediate physical custodian.

10. Respondent THOMAS GILES is sued in his official capacity as Field Office Director, Enforcement and Removal Operations, ICE Los Angeles Field Office, which arrested Petitioner and under whose authority he is detained.

11. Respondent DAVID VENTURELLA is sued in his official capacity as Acting Director of ICE, 500 12th Street SW, Washington, DC 20536. ICE is the component of DHS responsible for Petitioner's arrest and detention.

12. Respondent MARKWAYNE MULLIN is sued in his official capacity as Secretary of Homeland Security, 2707 Martin Luther King Jr. Avenue SE, Washington, DC 20528. The Secretary is the legal custodian of persons detained under the Immigration and Nationality Act.

13. Respondent TODD BLANCHE is sued in his official capacity as Attorney General of the United States, 950 Pennsylvania Avenue NW, Washington, DC 20530. The Attorney General administers the Executive Office for Immigration Review, before which Petitioner's removal proceedings are pending.

## IV. NO ADMINISTRATIVE EXHAUSTION IS REQUIRED

14. Section 2241 contains no statutory exhaustion requirement. Exhaustion in immigration habeas is prudential, and "courts have discretion to waive" it. *Puga v. Chertoff*, 488 F.3d 812, 815 (9th Cir. 2007). Waiver is appropriate where "administrative

remedies are inadequate or not efficacious, pursuit of administrative remedies would be a futile gesture, irreparable injury will result, or the administrative proceedings would be void." *Laing v. Ashcroft*, 370 F.3d 994, 1000 (9th Cir. 2004).

15. Petitioner discloses that an Immigration Judge denied his request for a custody redetermination on September 14, 2026, and that an appeal to the Board of Immigration Appeals ("BIA") is available until October 15, 2026 (Exhibit F). That remedy is not adequate for the claims raised here, for three reasons. First, custody-redetermination proceedings are, by regulation, "separate and apart from" every other proceeding, 8 C.F.R. § 1003.19(d); they decide flight risk and danger under *Matter of Guerra*, 24 I&N Dec. 37 (BIA 2006). Neither the Immigration Judge nor the BIA has authority to adjudicate whether an arrest complied with 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8, to decide Petitioner's Fourth and Fifth Amendment claims, to apply the Administrative Procedure Act, or to order release as the remedy for an unlawful arrest. An administrative process that cannot reach the claim or grant the relief is not a remedy to be exhausted. Second, the injury is continuing: every day of custody founded on an unlawful arrest is a fresh deprivation of liberty, and a BIA appeal will not be decided for months. Third, Petitioner's claims rest on Government records already in the Court's hands; no agency fact-finding is required.

16. Petitioner's posture is therefore unlike that in *Leonardo v. Crawford*, 646 F.3d 1157 (9th Cir. 2011), where the petitioner sought habeas review of the Immigration Judge's adverse bond determination before appealing it to the BIA. Petitioner does not ask this Court to review, reweigh, or set aside the Immigration Judge's flight-risk determination. He challenges the lawfulness of the arrest from which his custody derives — a question the Immigration Judge did not decide and the BIA cannot.

17. This Petition does not seek review of the Immigration Judge's bond decision, and Petitioner's separate BIA appeal, if filed, will not present the questions raised here.

## V. FACTUAL BACKGROUND

### A. Lawful Admission, Pending Asylum, Work Authorization, and a Known Address

18. Petitioner was admitted to the United States at Hartsfield-Jackson Atlanta International Airport on December 18, 2023, as a B-2 visitor, with authorization to remain until June 17, 2024 (Exhibit B, CBP Form I-94). He is a commercial engineer by training who operated a private school in Quito, Ecuador, with his wife, SYLVIA MARGOTH MALDONADO MASABANDA, to whom he has been married since March 20, 1997.

19. On September 13, 2024, within one year of his admission, Petitioner's wife filed Form I-589, Application for Asylum and for Withholding of Removal, with USCIS, listing Petitioner as her dependent spouse. USCIS acknowledged the filing under receipt number LGL2490228309 on September 24, 2024, and on November 11, 2025 issued an Annual Asylum Fee receipt confirming payment of the fee (Exhibit B). Both notices were mailed by USCIS to the family's Salt Lake City address. Petitioner attended his biometrics appointment. The application remains pending; the family was awaiting an interview.

20. On April 29, 2025, USCIS issued Petitioner an Employment Authorization Document, category (c)(8) (pending asylum), valid through April 28, 2030, and the Social Security Administration issued him a Social Security card on July 10, 2025 (Exhibit A). Petitioner has worked since then as a caregiver for disabled and elderly persons, including military veterans, for a home-care company in Salt Lake City, and was completing certified-nursing-assistant coursework. He filed a federal income tax return for tax year 2025. He holds a Utah driver's license. He attends a congregation in Salt Lake City when his work schedule permits.

21. Petitioner resides with his wife in Salt Lake City, Utah, at the address printed on USCIS's November 11, 2025 notice and, as shown below, the same address ICE itself recorded on the day of his arrest (Exhibits B, C). (The street address is omitted from this

public filing under Local Rule 5.2-1 and appears in the unredacted exhibits.) His son, MATTHEW ALEXANDER MOSCUI MALDONADO, age 26, lives in Salt Lake City in lawful status and is employed under post-completion optional practical training. Two adult children remain in Ecuador.

22. Petitioner has no criminal history anywhere in the world. He has never been arrested by any police agency, never been the subject of a prior immigration proceeding or removal order, and never been asked by ICE to report for any appointment. ICE's own records checks on the day of his arrest returned "No Criminal History" and negative results in NCIC and TECS (Exhibit C at 2).

**B. The Warrantless Arrest at John Wayne Airport on August 14, 2026**

23. In August 2026 Petitioner, his wife, his son Matthew, and Matthew's fiancée, ADRIENNE ELIZABETH TAYLOR, flew from Utah to Orange County, California, to see the venue for the couple's October wedding and to meet Ms. Taylor's family. Petitioner had previously flown domestically to Texas without incident. He traveled under his own name using his own identification and passed through Transportation Security Administration ("TSA") screening to board the flight, which landed at John Wayne Airport on the morning of August 14, 2026.

24. According to the I-213, on August 13, 2026 — the day before the arrest — ICE's Pacific Enforcement Response Center in Santa Ana "sent a Transportation Security Administration domestic flight lead to the ERO Los Angeles for review and enforcement action" (Exhibit C at 3). ICE thus knew, at least a day in advance, Petitioner's name, date of birth, A-number, photograph, home address, and — through the TSA lead itself — the flight on which he would arrive at John Wayne Airport. ICE did not obtain an administrative warrant of arrest (Form I-200) and execute it when he arrived or at his home. Instead, "ERO Los Angeles officers conducted a targeted enforcement operation at John Wayne International Airport . . . to locate and arrest MOSCUI" (*id.* at 2).

25. At approximately 8:55 a.m., having just arrived, Petitioner, his son, and Ms. Taylor were walking through the secured concourse toward the terminal exit and had

stopped at the restrooms across from Gate 16. Two travelers waiting at Gate 16 for a departing flight to Missoula, Montana — Jarred Matthew Sturges and Jessica Danielle Carreón, who had never met the family — watched what followed from roughly ten to forty feet away. Each has executed a notarized declaration under penalty of perjury (Exhibits D, E). Their accounts differ in detail, as independent accounts do, but they agree on the facts that matter here.

26. Petitioner recalls that as he came out of the men's restroom someone called his name, he turned, and a man pushed him. The men who approached wore black T-shirts and black or khaki trousers, with no uniform or visible insignia. Petitioner does not recall any of them identifying himself as a law-enforcement officer, displaying a warrant, or telling him that he was under arrest or why; they spoke to him only in English, and his English is limited. From the gate, Ms. Carreón and Mr. Sturges at first took the encounter for an argument among travelers; Ms. Carreón states that "[e]ven we couldn't tell they were ICE agents at first" (Exhibit E).

27. According to Ms. Carreón, one of the plainclothes men escalated the encounter and got in the face of Petitioner's son's fiancée "very aggressively"; Petitioner stepped between them and put his hands out "open palmed to create some distance," protectively; he "never touched them." One of the men then grabbed Petitioner by his shirt collar and pushed him backward several feet, and another grabbed the young woman by both shoulders and threw her to the floor (Exhibit E). Petitioner's son pleaded with the officers to wait, telling them that he had all of his father's paperwork and asking to be allowed to show it to them. "They ignored him." (*Id.*) Mr. Sturges, who began watching slightly later, saw Petitioner "calmly walking" toward the terminal exit between two agents who each held one of his arms, until the agents shoved Petitioner's son and the son's fiancée, pinned Petitioner against a wall, and "dragged Martin down to the ground" face first, kneeling on him (Exhibit D).

28. Both eyewitnesses state that Petitioner did not resist. Ms. Carreón states that, while pinned against a pillar, Petitioner "put his hands behind his back and allowed the

ICE agents to put on handcuffs," and that an officer then "pulled out his taser and started tasing Martin in the back," repeatedly, as Petitioner fell to his knees and then lay flat on the floor, spasming, while she and others in the crowd shouted that he was not resisting. When a woman in the crowd tried to stop the tasing, another officer aimed his taser at her and fired it, missing her (Exhibit E). Mr. Sturges describes the officers, with Petitioner pinned under them, threatening Petitioner with a taser and then tasing him before handcuffing him; he states that the officers "escalate[d] the situation and use[d] force on a man who was already walking himself out with them" (Exhibit D). Neither eyewitness describes Petitioner striking, pushing, or attempting to flee from anyone.

29. Petitioner, who had been in physical therapy since March 2026 for tendinitis of the right rotator cuff and cervical radiculopathy (Exhibit G), recalls repeatedly telling the officers in Spanish that his shoulders were injured, asking them not to twist his arms, and calling out for his son. He then felt a blow to his back and an electric current in his right leg, fell, and lost awareness of his surroundings. When the officers lifted him he was trembling uncontrollably and bleeding from the probe wound in his leg. They handcuffed him behind his back notwithstanding his injured shoulders and pushed him out of the terminal to an unmarked black car. Only after the taser, by ICE's own account, did "Team 4 officers inform[] MOSCUI that they had a warrant for his arrest" (Exhibit C at 2). No warrant was shown to him then or at any later time.

30. Mr. Sturges recorded the arrest on his mobile telephone and later provided his contact information to Petitioner's son so that the recording could be sent to him (Exhibits D, E).

31. Because Petitioner could not walk unaided, was trembling, dizzy, nauseated, and had a severe headache, the officers transported him to UCI Health in Irvine for "medical clearance." The emergency department discharged him with prescriptions for meclizine, omeprazole, and ondansetron (Exhibit C at 3). Weeks earlier, on July 23, 2026, Petitioner had been evaluated for acute vertigo with headache and referred to an emergency department to rule out a central neurological cause (Exhibit H). At the

hospital, one of the officers — who, Petitioner then learned, spoke Spanish — told him that he should have left the country in June 2024. Petitioner answered that he had a pending asylum application and legal work authorization. The officer did not respond. That was the first explanation of any kind Petitioner received for his seizure.

**C. ICE's Own Record of the Arrest**

32. The I-213 and its I-831 continuation pages (Exhibit C) were prepared by Deportation Officer S. Diep (No. 10812) and Officer Alexander Nguyen and reviewed by Examining Officer M. Medrano (No. 6752). The form records the "Method of Location/Apprehension" as "NCA" and the "Date/Hour" of the action as 08/14/2026 at 11:12 — more than two hours after the seizure. The line reciting that the "[a]lien has been advised of communication privileges" bears the handwritten date "8/13/2026," the day before Petitioner was arrested.

33. The narrative contains no statement that any officer believed Petitioner was likely to escape before a warrant could be obtained; no facts bearing on that question; no reference to 8 U.S.C. § 1357(a)(2) or 8 C.F.R. § 287.8(c)(2); and no explanation of why, having received the lead on August 13, ICE did not obtain a warrant. The only justification offered for the arrest is that Petitioner is "a B-2 overstay."

34. The I-213 also contains statements that ICE's own records contradict. It lists Petitioner's "Immigration Record" as "NEGATIVE," while conceding on the next page that his I-589 "is pending with USCIS." It records his "Type of Employment" as "Unemployed or Retired" and his occupation as unknown, although USCIS issued him an EAD sixteen months earlier and he was employed. It states that the "[s]ubject does not have children or dependents," although his adult son was standing beside him when he was arrested and the form elsewhere identifies the two people who tried to help him as "MOSCUI's family members." It leaves the spouse field blank while checking the "Married" box. Petitioner was never asked about his marital status, his children, or his employment.

35. The I-213 characterizes Petitioner's conduct as "actively resist[ing] by refusing to give his hand and arm to Team 4 arresting officer" and states that "two unknown individuals, who were later identified as MOSCUI's family members, attempted to intervene by pushing and shoving ERO officers" (Exhibit C at 2). It does not allege that Petitioner struck, pushed, threatened, or attempted to flee from any officer, and Petitioner was not charged with any offense. The two disinterested eyewitnesses describe the reverse of the I-213's account: that the officers shoved Petitioner's son and threw his son's fiancée to the floor, that Petitioner never touched an officer, and that he was tased after he had submitted (Exhibits D, E). The I-213 does not mention that an officer fired a taser at a bystander.

**D. Detention and Custody Proceedings**

36. On August 14, 2026, Supervisory Detention and Deportation Officer M. Medrano (No. 6752) — the I-213's examining officer — issued a Notice to Appear (Form I-862) in Santa Ana (Exhibit I). The Notice to Appear checks the box stating that Petitioner has "been admitted to the United States," not the boxes for an "arriving alien" or an alien "present in the United States who has not been admitted or paroled," and charges only removability under INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B), as a nonimmigrant visitor who remained beyond June 17, 2024. It lists Petitioner's residence as the Adelanto detention facility, not the Salt Lake City home address ICE recorded the same day, and set an initial hearing for August 31, 2026 at the Adelanto Immigration Court (*id.*). ICE also served a Form I-286 Notice of Custody Determination and a Form I-826 (Exhibit C at 3) and transferred Petitioner to the Adelanto ICE Processing Center, where he remains. As an admitted nonimmigrant charged under § 237, Petitioner is detained, if at all, under INA § 236(a), 8 U.S.C. § 1226(a). Neither the I-286 nor any Form I-200 warrant of arrest has been provided to Petitioner's counsel. Respondents should be required to produce any warrant, and its time of issuance, with their return.

37. On September 14, 2026, Immigration Judge Curtis White of the Adelanto Immigration Court, after a hearing at which DHS argued that Petitioner was dangerous

because he had "resisted" the officers, denied Petitioner's request for a change in custody status "because the respondent failed to meet his burden to establish that he is not a flight risk" (Exhibit F). The order makes no finding of danger. Both parties reserved appeal; the appeal deadline is October 15, 2026. Petitioner's next master-calendar hearing is set for September 30, 2026.

38. Petitioner's custody has aggravated his medical conditions. He has been unable to continue physical therapy for his shoulders; he suffers persistent gastritis and diarrhea for which he must take medication twice daily; and he reports being unable to sleep. As of September 29, 2026, he has been detained for forty-six (46) days.

## VI. LEGAL FRAMEWORK

### A. Congress Has Authorized Warrantless Immigration Arrests Only Where the Person Is Likely to Escape Before a Warrant Can Be Obtained

39. The Immigration and Nationality Act permits an immigration officer, without a warrant, "to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest." INA § 287(a)(2), 8 U.S.C. § 1357(a)(2). The implementing regulation is categorical: "A warrant of arrest shall be obtained except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained." 8 C.F.R. § 287.8(c)(2)(ii). The regulation further requires that "[a]t the time of the arrest, the designated immigration officer shall, as soon as it is practical and safe to do so: (A) [i]dentify himself or herself as an immigration officer who is authorized to execute an arrest; and (B) [s]tate that the person is under arrest and the reason for the arrest." *Id.* § 287.8(c)(2)(iii).

40. The statute thus requires two independent determinations before a warrantless civil arrest: probable cause of unlawful presence and probable cause that the person is likely to escape before a warrant can be obtained. "Reason to believe" in § 1357 means Fourth Amendment probable cause. *Tejeda-Mata v. INS*, 626 F.2d 721, 725 (9th Cir.

1980). Where the Government did not allege grounds for a reasonable belief that the persons arrested were likely to escape, "the plain language of 8 U.S.C. § 1357(a)(2) . . . forecloses the possibility of a permissible civil arrest under these circumstances." *Mountain High Knitting, Inc. v. Reno*, 51 F.3d 216, 218 (9th Cir. 1995). Where no federal warrant has issued, federal officers "have more limited authority" to arrest. *Arizona v. United States*, 567 U.S. 387, 408 (2012).

41. The determination must be individualized. Unlawful presence alone cannot supply the escape finding, because every person subject to civil immigration arrest is alleged to be unlawfully present. In *Vasquez Perdomo*, after reviewing the Government's own I-213 forms and deposition testimony, this District found that the Government was likely operating an unlawful "Escape Risk Policy" under which over one-third of sampled warrantless arrestees had no escape analysis anywhere in their records. *Vasquez Perdomo v. Mullin*, No. 2:25-cv-05605-MEMF-SP, Dkt. 738 (C.D. Cal. Sept. 2, 2026). The court enjoined warrantless arrests made "without a prearrest individualized determination by the arresting agent or officer of probable cause that the person being arrested is likely to escape before a warrant can be obtained, as required by 8 U.S.C. 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)"; held that "[m]ere presence within the United States in violation of United States immigration law is not, by itself, sufficient"; enjoined ICE's January 28, 2026 policy memorandum to the extent it treats unlawful status as establishing escape risk; required agents to document "[t]he specific, particularized facts that supported the agent's or officer's prearrest probable cause to believe that the person was likely to escape"; and denied the Government's request for a stay. *Id.* The court certified a class of "[a]ll persons, since June 6, 2025, who have been arrested or will be arrested in this District for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person poses a likelihood of escape." *Id.*, Dkt. 739. Petitioner's arrest preceded the injunction, but the injunction confirms what the statute has always required. Even under the Government's own January 28, 2026 memorandum, a person is "likely to escape" only if the officer determines that he is "unlikely to be

located at the scene of the encounter or another clearly identifiable location once an administrative warrant is obtained."

**B. The Fourth and Fifth Amendments**

42. A civil immigration arrest is a seizure subject to the Fourth Amendment's reasonableness requirement. A seizure that violates the statute and regulations that define the officer's authority, or that is effected without the officer identifying himself or stating its basis, is unreasonable. The Ninth Circuit has recognized that egregious Fourth Amendment violations by immigration officers, and arrests made in violation of ICE's own regulations, are serious enough to require suppression of their fruits in removal proceedings. *Gonzalez-Rivera v. INS*, 22 F.3d 1441, 1448–52 (9th Cir. 1994); *Perez Cruz v. Barr*, 926 F.3d 1128, 1137–46 (9th Cir. 2019). Those decisions address the evidentiary consequences of an unlawful arrest inside the removal case; they do not hold that suppression is the only consequence, or that the Executive may continue to imprison a person on the strength of an arrest Congress did not authorize. The Due Process Clause "applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent," *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001), and "[f]reedom from imprisonment . . . lies at the heart of the liberty that Clause protects," *id.* at 690; see *Singh v. Holder*, 638 F.3d 1196, 1203–04 (9th Cir. 2011).

**C. Habeas Corpus Is the Remedy for Custody That Is Unlawful at Its Inception**

43. The writ "shall not extend to a prisoner unless . . . [h]e is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). Custody obtained through an arrest that Congress did not authorize is custody in violation of the laws of the United States. The habeas court "shall . . . dispose of the matter as law and justice require," 28 U.S.C. § 2243, and possesses inherent authority to order release. See *Vasquez Perdomo v. Noem*, No. 2:25-cv-05605, Dkt. 132 (C.D. Cal. July 30, 2025) (ordering release of habeas petitioner pending decision). Petitioner acknowledges that the *Vasquez Perdomo* preliminary injunction did not decide the remedy for individual class members; that question is presented here.

44. Respondents may invoke *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1984), and *United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 158 (1923), for the proposition that an unlawful arrest does not by itself defeat later custody. Neither controls here. *Lopez-Mendoza* holds that the "body" or identity of a respondent is not suppressible as the fruit of an unlawful arrest in the removal proceeding — a rule about the exclusionary remedy at the deportation hearing, not about whether the Executive may hold a person in custody that Congress never authorized. *Bilokumsky* was a challenge to a deportation order in which, the Court held, "sufficient ground for his detention by the government [was] shown." 263 U.S. at 158. As a court in this District explained in granting release on a § 1357(a)(2) claim, a petitioner who "is not challenging a removal order but rather the legality of his detention during removal proceedings" stands differently: "A lack of statutory authority for his warrantless arrest renders that detention illegal and justifies release." *Villa Cambron v. Johnson*, No. 5:26-cv-04624-KES, slip op. n.2 (C.D. Cal. Sept. 1, 2026); accord *Barrios Chan v. Acting Warden*, No. 5:26-cv-04820-ACCV (C.D. Cal. Sept. 25, 2026) (ordering release to restore the status quo ante); *Juarez Perez v. Warden*, No. 5:26-cv-05074-WLH (C.D. Cal. Sept. 24, 2026).

45. Petitioner acknowledges that other decisions in this District have ordered only a custody hearing under 8 U.S.C. § 1226(a) in comparable circumstances. E.g., *Herrera Rivas v. Semaia*, No. EDCV 26-5114-AS (C.D. Cal. Sept. 18, 2026). That remedy would be empty here. Petitioner has already had a § 1226(a) hearing — on a record built from the same I-213, with the burden on him, before an adjudicator without authority to consider whether the arrest was lawful. A second such hearing would not address the violation pleaded in this Petition.

## VII. CLAIMS FOR RELIEF

**COUNT ONE — Warrantless Arrest Without Probable Cause of Likelihood of Escape (8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2)(ii); 28 U.S.C. § 2241(c)(3))**

46. Petitioner incorporates the preceding paragraphs.

47. Petitioner was arrested without a warrant. No judicial warrant existed. To the extent Respondents contend that a Form I-200 existed at 8:55 a.m. on August 14, 2026, no such warrant was in the possession of, displayed by, or executed by the arresting officers; ICE's own record places the "warrant" statement after the seizure and the use of force, and records the administrative action at 11:12 a.m. Respondents bear the burden of producing any warrant and establishing when it was issued.

48. At the time of the arrest, no officer had reason to believe — and no reasonable officer could have believed — that Petitioner was likely to escape before a warrant could be obtained. ICE had held the lead for at least a day. ICE knew Petitioner's name, photograph, date of birth, A-number, home address, pending asylum application, work authorization, and — from the TSA lead itself — the flight on which he would arrive. Petitioner was not leaving anywhere: he had just landed, under his own name, on a domestic flight whose booking and TSA screening were the very source of ICE's lead, and he was walking toward the terminal exit with his family. He would have been located at his home or at any other "clearly identifiable location" the moment a warrant issued. When the officers approached, he did not run; according to one eyewitness he was "calmly walking" out with the officers when they took him to the ground (Exhibit D), and his son offered the officers his immigration papers, which they refused to look at (Exhibit E). The I-213 documents no escape determination because none was made.

49. Petitioner is a member of the class certified in *Vasquez Perdomo v. Mullin*, Dkt. 739, having been arrested by federal agents without a warrant in the Central District of California after June 6, 2025 without an individualized escape-risk assessment, and his arrest is an instance of the Escape Risk Policy that this District has found likely unlawful.

50. Because the arrest exceeded the authority conferred by 8 U.S.C. § 1357(a)(2) and violated 8 C.F.R. § 287.8(c)(2)(ii), the custody that originated in it and continues to rest upon it is custody in violation of the laws of the United States, and the writ must issue.

**COUNT TWO — Unreasonable Seizure (Fourth Amendment; 8 C.F.R. § 287.8(c)(2)(iii))**

51. Petitioner incorporates the preceding paragraphs.

52. Plainclothes officers seized Petitioner by force without a warrant, without probable cause that he was likely to escape, without identifying themselves as immigration officers, and without stating that he was under arrest or the reason for it, although it was practical and safe to do so in the secured area of an airport terminal at 8:55 a.m. They took a 56-year-old man with a documented shoulder injury to the floor and discharged a taser into him — according to an eyewitness, repeatedly and after he had submitted to handcuffing (Exhibit E) — while he was asking for his son. The seizure was unreasonable under the Fourth Amendment and violated 8 C.F.R. § 287.8(c)(2)(iii). The Government's characterization of Petitioner's response to unidentified men grabbing him as "resistance" is contradicted by two disinterested eyewitnesses and cannot retroactively justify a seizure that was unlawful when it began.

53. Petitioner's continued detention is the direct fruit of that unreasonable seizure. Release is the appropriate remedy; in the alternative, and without prejudice to any motion in the removal proceedings, Petitioner is entitled to a declaration that the arrest was unlawful and that the evidence obtained through it, including the I-213, may not be used to justify his custody.

**COUNT THREE — Deprivation of Liberty Without Due Process (Fifth Amendment)**

54. Petitioner incorporates the preceding paragraphs.

55. Petitioner has a fundamental liberty interest in freedom from physical restraint. Respondents deprived him of it through an arrest Congress did not authorize, and have prolonged the deprivation on the basis of a Government record that misstates his immigration record, his employment, his family, and the circumstances of his arrest, and that DHS then used before the Immigration Judge to portray him as dangerous and likely to flee. Detention of a work-authorized affirmative asylum applicant of known

address, with no criminal history, who was awaiting a USCIS interview and who has never been asked to report to any agency, bears no reasonable relation to any legitimate governmental purpose that could not be served by the Notice to Appear itself. The detention violates the Due Process Clause.

**COUNT FOUR — Administrative Procedure Act (5 U.S.C. § 706(2)(A), (C))**

56. Petitioner incorporates the preceding paragraphs.

57. Petitioner's arrest and Respondents' decision to detain him are final agency actions for which Petitioner has no other adequate remedy in a court. 5 U.S.C. § 704. They were taken "in excess of statutory jurisdiction, authority, or limitations," *id.* § 706(2)(C), because § 1357(a)(2) confers no authority to arrest without a warrant absent a likelihood of escape, and they were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A), because they rest on no escape analysis at all, on the unlawful status-equals-escape policy enjoined in *Vasquez Perdomo*, and on a record of the arrest that the agency's own files contradict. The actions should be held unlawful and set aside.

## VIII. RELEASE BY THIS COURT IS THE ONLY ADEQUATE REMEDY

58. Petitioner does not ask this Court to review the Immigration Judge's September 14, 2026 custody decision, and he does not ask for another bond hearing. The violation pleaded here is the arrest, and no bond hearing can cure it. Custody-redetermination proceedings under 8 C.F.R. § 1003.19 are "separate and apart from" all other proceedings; the Immigration Judge had, and the Board will have, no authority to decide whether ICE complied with 8 U.S.C. § 1357(a)(2), no authority to decide Petitioner's constitutional or APA claims, and no authority to order release on the ground that the custody was unlawful at its inception. A remand for further custody proceedings would therefore be a hollow formality that prolongs, rather than remedies, the violation.

59. The Government's likely alternative — that the sole consequence of an unlawful arrest is the possible suppression of evidence in the removal case — would leave Petitioner imprisoned for the months or years that his removal proceedings will

take, on the strength of the very arrest the statute forbade. That is not what habeas corpus is for. Where custody is unlawful, the remedy the Great Writ provides is release. 28 U.S.C. § 2243. Petitioner's forty-six days of detention, his deteriorating health, his family's dependence on his income, and the imminent wedding of his son are irreparable injuries that accrue daily.

60. Release is also the remedy that fits the violation. Had ICE followed the statute, it could have obtained an I-200 and, on any lawful custody assessment of a work-authorized affirmative asylum applicant with a known address and no record, it would have had every reason to serve the Notice to Appear and let Petitioner return home to await his hearing. An order of release places Petitioner in the position the law required, and leaves Respondents free to pursue removal proceedings against him in the ordinary course. Upon release Petitioner will reside with his wife and son in South Salt Lake, Utah, at an address that counsel will provide to Respondents and, if the Court wishes, file under seal (L.R. 5.2-1), and he will appear at every hearing before the Immigration Court.

## IX. DECLARATORY RELIEF

61. An actual controversy exists between Petitioner and Respondents regarding the lawfulness of his arrest and detention. Pursuant to 28 U.S.C. § 2201, Petitioner is entitled to a declaration that his warrantless arrest on August 14, 2026 violated 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii)–(iii) and the Fourth Amendment, and that his resulting detention violates the laws and Constitution of the United States.

## X. PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully requests that this Court:

1. ISSUE an Order to Show Cause directing Respondents to show cause, within three (3) days of the Court's order, why the Writ of Habeas Corpus should not be granted, 28 U.S.C. § 2243, and set an expedited briefing schedule consistent with General Order 26-05;

2. ISSUE a Writ of Habeas Corpus ordering Respondents to release Petitioner immediately from custody on his own recognizance or, in the alternative, on such reasonable conditions of supervision as the Court deems appropriate;
3. DECLARE, pursuant to 28 U.S.C. § 2201, that Petitioner's warrantless arrest on August 14, 2026, violated 8 U.S.C. § 1357(a)(2), 8 C.F.R. § 287.8(c)(2)(ii)–(iii), and the Fourth Amendment, and that his continued detention violates the laws and Constitution of the United States;
4. ORDER Respondents, pending decision on this Petition, not to transfer Petitioner out of the Central District of California and to provide the notice required by General Order 26-05 before any removal of Petitioner from this District;
5. ORDER Respondents, upon release, to return to Petitioner all personal property taken from him at arrest or intake, including his mobile telephone, wristwatch, bracelet, and cash, and to file a status report within three (3) days of release confirming release and the return of property;
6. ORDER that Petitioner's release shall not be conditioned on any bond or electronic monitoring, and that Respondents may not re-detain Petitioner on the same facts without prior notice to Petitioner's counsel and an opportunity to be heard;
7. AWARD Petitioner his reasonable attorney's fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412, to be requested by a properly filed separate motion; and
8. GRANT such other and further relief as the Court deems just and proper.

Dated: September 29, 2026

Respectfully submitted,

*Christopher J. DeSalva*

Christopher Joseph DeSalva

Attorney for Petitioner

**VERIFICATION PURSUANT TO 28 U.S.C. § 2242**

I, Christopher Joseph DeSalva, declare as follows:

1. I am an attorney licensed to practice in the State of California and admitted to practice before this Court, and I am counsel of record for Petitioner Martin Humberto Moscui.

2. Petitioner is detained at the Adelanto ICE Processing Center in Adelanto, California, and is unable to verify this Petition personally. Pursuant to 28 U.S.C. § 2242, I verify this Petition on his behalf.

3. I have reviewed Petitioner's immigration records, the exhibits attached to this Petition, and information provided by Petitioner and his family. The factual allegations in the foregoing Petition are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 29, 2026, at Indio, California.

Christopher J. DeSalva

Christopher Joseph DeSalva
Attorney for Petitioner

**CERTIFICATE OF SERVICE**

I, Dr. Victor M. Viruena, declare as follows:

I am over the age of eighteen years and not a party to this action. My business address is 73-350 El Paseo Drive, Suite 204, Palm Desert, California 92260. I make this declaration on behalf of Christopher J. DeSalva, Esq., counsel for Petitioner.

On September 29, 2026, I caused the foregoing VERIFIED PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241; REQUEST FOR ORDER TO SHOW CAUSE WITHIN THREE (3) DAYS; DECLARATORY RELIEF, together with its Index of Exhibits and Exhibits A through I, to be filed electronically with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to all Respondents and all counsel of record, including the United States Attorney's Office for the Central District of California as counsel for the named Respondents. Service is complete upon electronic filing pursuant to Fed. R. Civ. P. 5(b)(2)(E) and Local Rule 5-3.2. A courtesy copy was also transmitted by electronic mail to USACAC.ImmHabeas@usdoj.gov pursuant to General Order 26-05.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 29, 2026, at Palm Desert, California.

Dr. Victor Viruena

Dr. Victor M. Viruena
on behalf of Christopher J. DeSalva, Esq.

**INDEX OF EXHIBITS**
(ordered by first citation in the Petition)

| Ex. | Document | Date | Cited in Petition |
| --- | --- | --- | --- |
| A | Employment Authorization Document, category (c)(8); Social Security card (redacted, Fed. R. Civ. P. 5.2) | 04/29/2025; 07/10/2025 | ¶¶ 1, 20 |
| B | CBP Form I-94 admission record (B-2); USCIS Form I-797C receipt, Form I-589 (LGL2490228309); USCIS Annual Asylum Fee receipt | 12/18/2023; 09/24/2024; 11/11/2025 | ¶¶ 1, 18, 19, 21 |
| C | ICE Form I-213, Record of Deportable/Inadmissible Alien, with Form I-831 continuation pages (3 pp.) | 08/14/2026 | ¶¶ 2, 21, 22, 24, 29, 31, 32, 35, 36 |
| D | Declaration of Jarred Matthew Sturges (eyewitness), 28 U.S.C. § 1746, with notarial acknowledgment | 09/11/2026 | ¶¶ 2, 25, 27, 28, 30, 35, 48 |
| E | Declaration of Jessica Danielle Carreón (eyewitness), 28 U.S.C. § 1746, with notarial acknowledgment | 09/11/2026 | ¶¶ 2, 25, 26, 27, 28, 30, 35, 48, 52 |
| F | Order of the Immigration Judge, Adelanto Immigration Court (White, IJ), custody redetermination | 09/14/2026 | ¶¶ 5, 15, 37 |
| G | Intermountain Health physical-therapy progress note (tendinitis of right rotator cuff; cervical radiculopathy) (MRN redacted) | 03/17/2026 | ¶ 29 |
| H | Intermountain Health Instacare office-visit note (acute vertigo with headache; ED referral) (MRN redacted) | 07/23/2026 | ¶ 31 |
| I | DHS Form I-862, Notice to Appear, with certificate of service (DOB redacted) | 08/14/2026 | ¶ 36 |